# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**WHITNEY L. ARTMAYER,**

    **Plaintiff,**

  v.                                       Civil Action 2:16-cv-1070
                                             Chief Judge Edmund A. Sargus, Jr.
                                           Magistrate Judge Jolson

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Whitney L. Artmayer, filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying her Title II Disability Insurance Benefits application. For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED**, and that judgment be entered in favor of Defendant.

### I. BACKGROUND

#### A. Prior Proceedings

Plaintiff filed for disability insurance benefits ("DIB") on March 17, 2014, alleging a disability onset date of February 21, 2014. (*See* Doc. 9-3, Tr. 97, PAGEID #: 147). Her application was denied initially on June 23, 2014 (Doc. 9-4, Tr. 127, PAGEID #: 178), and upon reconsideration on November 14, 2014 (*id.*, Tr. 134, PAGEID #: 185). Administrative Law Judge Timothy G. Keller (the "ALJ") held a hearing on June 2, 2016 (Doc. 9-2, Tr. 40, PAGEID #: 89), after which he denied benefits in a written decision on July 5, 2016 (*id.*, Tr. 15–33, PAGEID #: 64–82). That decision became final when the Appeals Council denied review on September 12, 2016. (*Id.*, Tr. 1, PAGEID #: 50).

Plaintiff filed this case on November 9, 2016 (Doc. 1), and the Commissioner filed the administrative record on January 17, 2017 (Doc. 9). Plaintiff filed a Statement of Specific Errors on April 14, 2017 (Doc. 14), the Commissioner responded on May 26, 2017, (Doc. 15), and no reply was filed.

### B. Relevant Testimony at the Administrative Hearing

At the beginning of the hearing, Plaintiff acknowledged that she was recently released from jail for possession of drug paraphernalia for which she served six months. (Doc. 9-2, Tr. 43, PAGEID #: 92). Despite Plaintiff's testimony that she didn't begin illicit drug use until 2015, the ALJ directed Plaintiff's attention to a medical record from June 2015 that stated she had been using heroin for a year. (*Id.*, Tr. 54, PAGEID #: 103). In response, Plaintiff stated she wouldn't "contest that if it's in records. I just know that I'm trying to get better, just trying to do what I need to do." (*Id.*, Tr. 55, PAGEID #: 104). Plaintiff testified that she lost custody of her son in June 2015 as a result of her drug use. (*Id.*, Tr. 51, PAGEID #: 100).

Plaintiff testified that, prior to her jail time, she had to stop working in order to take care of her son, who suffers from Type I diabetes. (*Id.*, Tr. 44, PAGEID #: 93). Later in the hearing, however, the ALJ asked why she was not able to work, and she responded: "I'm not really able to do anything physically, I can't even stand on my own two feet." (*Id.*, Tr. 47, PAGEID #: 97). Plaintiff further explained that it was "most likely [her] fibromyalgia diagnosis" that caused her to apply for disability. (*Id.*, Tr. 48, PAGEID #: 97).

When asked by her attorney to give details about her mental health, Plaintiff stated that most days she feels hopeless, doesn't want to go to work, and doesn't want to take care of herself. (*Id.*, Tr. 49, PAGEID #: 98). Plaintiff testified that she suffers from anxiety that is

caused by "appointments, obligations, [and] interaction with people." (*Id.*, Tr. 49–50, PAGEID #: 98–99). Plaintiff also said she suffers from depression and has had suicidal ideation that resulted in two trips to the emergency room. (*Id.*, Tr. 50–51, PAGEID #: 99–100). Plaintiff stated that the medications she takes, however, improve her mental health condition. (*Id.*, Tr. 56–57, PAGEID #: 105–06).

In terms of daily activities, Plaintiff stated that she likes to sew clothes, blankets, and scarves because it helps with her anxiety and depression. (*Id.*, Tr. 56, PAGEID #: 105). She also confirmed during her attorney's questioning that on "good days"—which she testified occurs once or twice a week—she performs household chores and personal care. (*Id.*, Tr. 53, PAGEID #: 102). Further, Plaintiff testified that she attended Muskingum University until January 2014, in pursuit of a Master's degree in social work, but quit because she "was going through some mental problems and my son was ill and just–I wasn't doing well in school." (*Id.*).

### C. Relevant Background

From December 2013 to November 11, 2014, Plaintiff saw Brenda Verhey for outpatient counseling. (Doc. 9-9, Tr. 963–978, PAGEID #: 1019–34). On several occasions, Ms. Verhey noted Plaintiff's demeanor was depressed, defeated, or hopeless (*e.g.*, *id.*, Tr. 963–64, 966–67, 969–70, PAGEID #: 1019–20, 1022–23, 1025–26), but she was always described as cooperative (*id.*). In Ms. Verhey's treatment notes there were numerous occasions where Plaintiff was reported as a "NC/NS"—a no call, no show. (*Id.*, Tr. 968, 971–74, PAGEID #: 1024, 1027–30).

At a gynecology appointment on February 14, 2014, Plaintiff was noted to be oriented to person, place, or time, with normal mood and affect. (Doc. 9-7, Tr. 308, PAGEID #: 362).

On March 5, 2014, Plaintiff was evaluated by Georgeann Neuzil, CNS, following surgery

3

for endometriosis, who noted Plaintiff had some "mood swings" and was depressed due to ongoing conflict with her husband. (*Id.*, Tr. 338, PAGEID #: 392). At that time, Plaintiff was dysthymic, but had good eye contact, a logical thought process, intact memory and cognition, fair insight, good judgment, intact impulse control, and was described as being attentive, oriented, and cooperative. (*Id.*, Tr. 338–39, PAGEID #: 392–93). She reported using music, nature, reading, talking with others, prayer, and deep breathing as coping skills. (*Id.*, Tr. 339, PAGEID #:393).

Plaintiff began attending mental health therapy through Family Care Behavioral Health on March 26, 2014. (Doc. 9-10, Tr. 1043, PAGEID #: 1100). Plaintiff was described as pleasant, with clear speech, logical thoughts, and poor eye contact. (*Id.*, Tr. 1044, PAGEID #: 1101). Over the course of the next few months, over numerous appointments, Plaintiff was consistently described as pleasant, friendly, talkative, and calm. (*Id.*, Tr. 1034–42, PAGEID #: 1091–1099).

On April 14, 2014, Plaintiff submitted a Social Security Administration Function Report. (Doc. 9-6, Tr. 184, PAGEID #: 237). In the report, Plaintiff stated that she cared for her son by bathing him, clothing him, preparing meals, taking him to the doctor, and putting him to sleep. (*Id.*, Tr. 185, PAGEID #: 238). Plaintiff also reported that she prepared simple meals daily; she does laundry and cleans the bathroom sometimes; she leaves the house three to four days a week; she goes to the store once a month and shops online once every three months; she enjoys art, reading, journaling, sewing, and listening to music; and she socializes with her family and goes to church two to three days a week. (*Id.*, Tr. 186–89, PAGEID #: 239–42). Further, Plaintiff stated that she can follow written instructions "very well" and "get[s] along with authority

figures." (*Id.*, Tr. 189–90, PAGEID #: 242–43).

Plaintiff saw Dr. Steve Meyer, PhD on May 14, 2014, for a psychological evaluation relating to her claim for mental disability benefits. (Doc. 9-7, Tr. 461, PAGEID #: 515). At the appointment, Plaintiff denied having any problems getting along with authority figures and stated she last worked at Lowe's but quit "due to physical problems." (*Id.*, Tr. 462, PAGEID #: 516). Dr. Meyer noted that Plaintiff was currently prescribed psychotropic medications "with some positive response." (*Id.*). In terms of her appearance, Dr. Meyer opined that Plaintiff seemed tired, sad, and a little uncomfortable, her eye contact was inconsistent, and she sat with a rigid posture. (*Id.*, Tr. 463, PAGEID #: 517). Dr. Meyer also noted, however, that Plaintiff's appearance and hygiene were adequate, she was cooperative, and her thought processes were well organized. (*Id.*). Further, Plaintiff was described as "alert, clear, and oriented to person, place, time and situation[;]" she had no difficulty understanding simple or moderately complex instructions; her abilities were above average on the digit-span recall test; and her concentration, persistence, and pace on tasks were good. (*Id.*, Tr. 463–64, PAGEID #: 517–18). Dr. Meyer ultimately diagnosed Plaintiff with Adjustment Disorder with Depression and Anxiety. (*Id.*, Tr. 464, PAGEID #: 518).

On August 5, 2014, Plaintiff saw Dr. Ajay Sharma for medication management purposes. (Doc. 9-11, Tr. 1391, PAGEID #: 1449). Treatment notes suggest Plaintiff was previously diagnosed with major depressive order without mention of psychotic behavior, as well as generalized anxiety disorder. (*Id.*). Plaintiff was described as cooperative, spontaneous, and alert and oriented to time, place, and person. (*Id.*). Further, Plaintiff had good eye contact, but was noted as having a depressed mood and constricted affect. (*Id.*). Plaintiff was described in

5

the same manner at another follow-up appointment with Dr. Sharma on September 2, 2014. (*Id.*, Tr. 1387, PAGEID #: 1445).

Plaintiff met with Melinda Lutz, a licensed independent social worker, on September 11, 2014. (Doc. 9-9, Tr. 981, PAGEID #: 1037). Ms. Lutz reported that Plaintiff had "a very poor self view," poor eye contact, often blamed others, and opined that Plaintiff would likely be absent from work more than four days a month. (*Id.*). In completing a mental residual functional capacity form, Ms. Lutz stated, *inter alia*, that Plaintiff had mild impairments in interacting with the general public and maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; moderate impairments in maintaining attention and concentration for extend periods, understanding, remembering, and carrying out very short and simple instructions, and sustaining an ordinary routine; marked restrictions in getting along with coworkers or peers, accepting instructions and responding appropriately to criticism from supervisors, activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace; and no extreme restrictions. (*Id.*, Tr. 982–83, PAGEID #: 1038–39).

Five days later, Dr. Sharma completed the exact same mental residual functional capacity form. (*Id.*, Tr. 985, PAGEID #: 1041). Dr. Sharma stated that Plaintiff's prognosis was poor and that she would be absent from work more than four days per month. (*Id.*). As for Plaintiff's restrictions, Dr. Sharma opined that Plaintiff had "extreme" limitations in all sixteen of the listed categories. (*Id.*, Tr. 986–87, PAGEID #: 1042–43).

At another medication management appointment with Dr. Sharma on December 9, 2014, Plaintiff was described as having casual grooming, good eye contact, intact memory, an average

6

fund of knowledge, and fair insight and judgment. (Doc. 9-11, Tr. 1375, PAGEID #: 1433). Dr. Sharma also stated that Plaintiff was alert and oriented to time, place and person, with a depressed mood and constricted affect. (*Id.*). Treatment records show Dr. Sharma continued to see Plaintiff until August 10, 2015, with similar observations at each appointment. (*see id.*, Tr. 1342–1382, PAGEID #: 1400–1441).

At a counseling appointment on February 5, 2015, Plaintiff was described as pleasant and talkative throughout the visit. (Doc. 9-10, Tr. 1158, PAGEID #: 1215). Plaintiff reported that she spends most of her time painting, sewing, or writing, and explained that she auditioned for the Zaney Folies. (*Id.*). At another counseling appointment three weeks later, she complained of feeling overwhelmed and frustrated and appeared depressed. (*Id.*, Tr. 1157, PAGEID #: 1214).

Plaintiff was admitted to the Emergency Room on March 24, 2015, with suicidal ideation. (Doc. 9-10, Tr. 1120, PAGEID #:1177). Upon examination, Plaintiff was alert, cooperative, in no apparent distress, but had poor eye contact, and was described as having a depressed mood and constricted affect. (*Id.*, Tr. 1121–22, PAGEID #: 1178–79). Although Plaintiff was described as tearful, she was also described as "alert and oriented." (*Id.*, Tr. 1142, PAGEID #: 1199). While at the hospital, Plaintiff tested positive for Benzodiazepines. (*Id.*, Tr. 1122, PAGEID #: 1179).

Plaintiff was admitted to the hospital for suicidal thoughts once again on June 18, 2015. (*Id.*, Tr. 1159, PAGEID #: 1216). Upon admittance, Plaintiff was described as being well-developed, well-nourished, oriented to person, place, and time, cooperative, having poor eye contact, average intelligence, fair insight, fair judgment, with a depressed mood and constricted affect. (*Id.*, Tr. 1161, 1189, PAGEID #: 1218, 1246). Treatment notes state that "[t]he degree of

7

incapacity that she is experiencing as a consequence of her illness is moderate." (*Id.*, Tr. 1188, PAGEID #: 1245). During this visit, Plaintiff's toxicology screen tested positive for opiates and Methamphetamine (*id.*, Tr. 1166, 1222, PAGEID #: 1223, 1279), and Plaintiff admitted that she was "going through withdrawal" (*id.*, Tr. 1196, PAGEID #: 1253).

On December 22, 2015, Plaintiff completed a Background Questionnaire in which she stated that she could cook, wash dishes, mop, vacuum, shop for groceries sometimes, drive a car, and use public transportation. (Doc. 9-6, Tr. 233–34, PAGEID #: 286–87). Plaintiff reported that an ordinary day includes housework, errands, preparing meals, and interacting with her son. (*Id.*, Tr. 234, PAGEID #: 287). Additionally, for entertainment, Plaintiff stated she liked to sew, crochet, read, write poetry, paint, and sketch. (*Id.*).

State agency consultant Dr. Courtney Zuene, PsyD, reviewed Plaintiff's record on June 5, 2014, and concluded Plaintiff could understand and remember simple and most multi-step moderately complex instructions. (Doc. 9-3, Tr. 105, PAGEID #: 155). Dr. Zuene also opined that Plaintiff would do best in a static work environment that was a less public setting where only occasional superficial contact with coworkers is required. (*Id.*, Tr. 106–07, PAGEID #: 156–57). State agency consultant Dr. Jennifer Swain, PsyD, reached similar conclusions on November 11, 2014. (*Id.*, Tr. 122–23, PAGEID #: 172–73). Ultimately, Dr. Zuene and Dr. Swain opined that Plaintiff had mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. (*Id.*, Tr. 102, 118, PAGEID #: 153, 168).

### D. The ALJ's Decision

The ALJ found Plaintiff had the following severe impairments: obesity, degenerative

disease of the lumbar spine, fibromyalgia, non-dystrophic myotonia/muscle channelopathy, polysubstance dependence, and affective and anxiety-related disorders. (Doc. 9-2, Tr. 20, PAGEID #: 69). However, the ALJ held that there was no medical opinion of record to indicate the existence of an impairment or combination of impairments that meet or equal in severity the level of the Listings of Impairments. (*Id*., Tr. 21, PAGEID #: 70).

Specifically, the ALJ found that Plaintiff's mental symptomatology did not result in marked or extreme functional limitations in the areas of activities of daily living, social functioning, concentration/persistence/pace, or episodes of decompensation as required in "paragraph B" of Listing 12.04 or Listing 12.06. (*Id*., Tr. 22, PAGEID #: 71). Rather, the ALJ held as follows: Plaintiff had "mild" restriction in activities of daily living, as she was able to bathe herself, prepare simple meals, clean bathrooms, perform laundry, care for her son, drive, shop, and engage in a variety of hobbies; Plaintiff had moderate difficulties in social functioning; Plaintiff had moderate difficulties with regard to concentration, persistence, or pace; and Plaintiff had not experienced any extended episodes of decompensation. (*Id.*, Tr. 22–23, PAGEID #: 71–72). Thus, the ALJ found that Plaintiff did not satisfy the "paragraph b" criteria. (*Id.*).

In analyzing the "paragraph c" requirements, the ALJ opined that Plaintiff did not have a medically documented history of any of the three criteria—repeated episodes of decompensation, a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands would be predicted to cause the individual to decompensate, or a current history of one or more years' inability to function outside a highly supportive living arrangement. (*Id.*, Tr. 24, PAGEID #: 73). Thus, the ALJ held that Plaintiff did not meet any Listing.

As to Plaintiff's RFC, the ALJ opined has follows:

> The claimant has the physical residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). From a mental standpoint, she is able to understand, remember, and carry out simply repetitive tasks and maintain concentration and attention for two-hour segments over an eight-hour work period. She is able to respond appropriately to supervisors and coworkers in a task-oriented setting where contact with other is casual and infrequent. She is able to adapt to simple changes and avoid hazards in a setting without strict production quotas.

(*Id.*, Tr. 24, PAGEID #: 73).

In making this determination, specifically with respect to Plaintiff's mental functioning, the ALJ noted that Plaintiff was consistently observed with normal mood and affect, alert, oriented, and in no apparent distress between February and May 2014. (*Id.*, Tr. 28, PAGEID #: 77). The ALJ also pointed out that at a May 2014 appointment with psychologist Steven Mayer, Plaintiff was observed as tired, sad, a little uncomfortable, dysphoric, and anxious, but also was cooperative, alert, clear, fully oriented, and had no difficulty understanding simple or moderately complex instructions. (*Id.*). Further, the ALJ explained that Plaintiff exhibited good concentration, persistence, and pace of tasks, and denied having any problems getting along with authority figures. (*Id.*). Although Plaintiff was hospitalized for suicidal thoughts, the ALJ recognized that she was described as cooperative, alert, and oriented, during her visit and her toxicology screen was positive for illegal substances. (*Id.*, Tr. 29, PAGEID #: 78).

In sum, the ALJ concluded that Plaintiff retained substantially normal mental functioning and cognition, despite "some drug abuse and affective and anxiety-related symptomatology that aggravates under stress and intense social interactions." (*Id.*). In reaching this conclusion and in defining Plaintiff's RFC, the ALJ gave "significant weight, but not controlling weight," to the assessments of Dr. Zuene, Dr. Swain, and Dr. Meyer. (*Id.*, Tr. 29–30, PAGEID #: 78–79). More

specifically the ALJ stated that his RFC assessment "generally appears to accommodate the limitations indicated by Dr. Zuene, Dr. Swain, and Dr. Meyer." (*Id.*, Tr. 30, PAGEID #: 79).

Finally, the ALJ gave "no significant weight" to the assessments of treating source Dr. Sharma and Ms. Lutz. (*Id.*). The ALJ explained that Ms. Lutz's opinion was not well supported by the record and, because she is a social worker, her medical opinion is not included among the acceptable sources of medical evidence defined in the regulations. (*Id.*). Dr. Sharma's opinion, according to the ALJ, also was "not well supported by medically-acceptable clinical and laboratory diagnostic techniques, and are inconsistent with other substantial evidence in the case record." (*Id.*). Specifically, the ALJ noted that the medical record "generally documents normal mental functioning, even when mental symptomatology has been present," and marked and extreme mental work-related limitations were not consistent with Plaintiff's activities of daily living. (*Id.*). The ALJ also considered the fact that the record evidenced only conservative, non-invasive treatment and Plaintiff's medications appear to have helped control her symptomatology. (*Id.*, Tr. 31, PAGEID #: 80).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). "Therefore, if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

## III. DISCUSSION

Plaintiff alleges only one statement of error—that the ALJ erred in assigning "no significant weight" to the treating source opinion of Dr. Sharma. (Doc. 14 at 17–18). Plaintiff concedes that "the ALJ applied the correct legal standard to this treating source opinion," but argues "his reasoning nonetheless runs afoul of the legal standard because it is not supported by the evidence in the record." (*Id.* at 18).

Two related rules govern how an ALJ is required to analyze a treating physician's opinion. *Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016). The first is the "treating physician rule." *Id.* The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted). However, "an ALJ may properly reject a treating physician's opinion that does not meet these standards." *Mixon v. Colvin*, 12 F. Supp. 3d 1052, 1063–64 (S.D. Ohio 2013) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529–31 (6th Cir. 1997).

Closely associated is "the good reasons rule," which requires an ALJ always to give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL 860695, at *4 (quoting *Blakley*, 581 F.3d at 406 (alterations in original)); 20 C.F.R. § 404.1527(c)(2). *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550–51 (6th Cir. 2010). In order to meet the "good reasons" standard, the ALJ's determination "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937.

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (internal citation and quotation marks omitted). The treating physician rule and the good reasons rule together create what has been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013).

Here, the ALJ declined to give controlling weight to Dr. Sharma, stating that his opinion was "not well supported by medically-acceptable clinical and laboratory diagnostic techniques, and [was] inconsistent with other substantial evidence in the case record." In particular, the ALJ relied on numerous mental health treatment records that "document[ed] normal mental functioning, even when mental symptomatology ha[d] been present." (Doc. 9-2, Tr. 30, PAGEID #: 79). Indeed, the ALJ referenced medical records where Plaintiff consistently was described as cooperative, talkative, alert to person, place and time, and displayed a normal mood

13

and affect. (*See id.*, Tr. 28–30, PAGEID #: 77–79). This is inconsistent with Dr. Sharma's mental residual functional capacity worksheet in which he opined Plaintiff had "extreme" limitations in every possible category.

By way of example, Dr. Sharma stated that Plaintiff had extreme limitations in her ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (*See* Doc. 9-9, Tr. 986, PAGEID #: 1042). However, there is no evidence in the record that Plaintiff's ability to maintain socially appropriate behavior was even limited, let alone extremely limited, and Plaintiff's appearance and hygiene were described as adequate by Dr. Meyer and others. Further, although Ms. Lutz mental residual functional capacity was given no significant weight by the ALJ, it is worth noting that she did not find a single category warranted a designation of an "extreme" limitation—further demonstrating the inconsistency of Dr. Sharma's opinion with the remainder of the record.

Additionally, the ALJ explained that Dr. Sharma's "extreme mental work-related limitations are inconsistent with the claimant's activities of living." (Doc. 9-2, Tr. 30, PAGEID #: 79). For example, Plaintiff herself reported that she gets along well with authority figures and that she could follow written instructions "very well." (*Id.*, Tr. 22–23, PAGEID #: 71–72). Moreover, Plaintiff attempted to care for her disabled son by bathing and clothing him, preparing his meals, taking him to doctors' appointments, and putting him to sleep. (*Id.*, Tr. 22, PAGEID #: 71). These activities were inconsistent with Dr. Sharma's extreme restrictions.

Finally, the ALJ noted that "[m]edications have helped control the claimant's symptomatology and the record does not document significant, persistent medication side effects." (*Id.*, Tr. 31, PAGEID #: 80). This was supported by Dr. Meyer's assessment, who

found Plaintiff's prescribed psychotropic medications had "some positive response." Moreover, Plaintiff herself testified at the hearing that she believed her medications helped her symptomatology. And although Plaintiff was hospitalized twice for mental health reasons, both times drug abuse was present which the ALJ found exacerbated the situation.

Plaintiff, on the other hand, argues that Dr. Sharma's opinion was consistent with his treatment notes, as his findings consistently noted a depressed mood, a constricted affect, and a low GAF score. (Doc. 14 at 1922). And Plaintiff argues that the ALJ essentially "cherry-picked" evidence and did not acknowledge that Plaintiff's stated activities only occur on her "good days" and that she is only able to shop for groceries "sometimes" and do chores "at times." (Doc. 14 at 21–22). Further, Plaintiff points to her hospitalizations and Ms. Lutz's opined marked limitations as being consistent with Dr. Sharma's opinion. (*Id.*). As mentioned above, however, Ms. Lutz's opinion hardly provides adequate support for Dr. Sharma's opined limitations. Even so, it is true that the record contains some evidence that may support Plaintiff's argument, but under the substantial evidence standard, the ALJ's findings are "not subject to reversal merely because substantial evidence exists in the record to support a different conclusion." *Mixon*, 12 F. Supp. 3d at 1064 (citing *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1996)). Rather, it is the ALJ's "function to resolve conflicts in the evidence, *see Hardaway v. Sec'y of H.H.S.*, 823 F.2d 922, 928 (6th Cir.1987)," and that is exactly what the ALJ did here. *Id.*

Consequently, although the ALJ recognized Plaintiff's affective and anxiety-related symptomatology, he heavily relied on the opinions of Dr. Zuene, Dr. Swain, and Dr. Meyer— who all found that Plaintiff had the cognitive capacity to understand, remember, and carryout

simple and complex instructions, and could maintain attention, concentration, persistence and pace to perform simple multistep tasks in a setting without strict production requirement—and ultimately found Plaintiff "retained substantially normal mental functioning and cognition." (*Id.*, Tr. 29–30, PAGEID #: 78–79).

Although Plaintiff may disagree with the ALJ's ultimate conclusion, his decision to reject Dr. Sharma's opinion was appropriate because he found it was inconsistent with the other substantial evidence in the record. Further, the ALJ's explanation constitutes sufficient detail to satisfy the good-reasons requirement and appropriately explained the disposition of the case to Plaintiff. *See Barncord v. Comm'r of Soc. Sec.*, No. 2:16-CV-389, 2017 WL 2821705, at *6 (S.D. Ohio June 30, 2017). Thus, the ALJ followed the two-step analysis created by the Sixth Circuit, as his findings and reasoning regarding Dr. Sharma's opinion were supported by substantial evidence. It was therefore not an error for the ALJ to refuse to give Dr. Sharma's opinion controlling weight. *See id.*

## IV. CONCLUSION

For the reasons stated, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 14) be **OVERRULED** and that judgment be entered in favor of Defendant.

### Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations

to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1). Failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140, 152–53 (1985).

    IT IS SO ORDERED.


Date: August 23, 2017                                          /s/ Kimberly A. Jolson
                                                                                KIMBERLY A. JOLSON
                                                                                UNITED STATES MAGISTRATE JUDGE